268 N.J. Super. 325 (1993)
633 A.2d 979
WILLIS DAISEY AND EDWARD DAISEY, EXECUTOR OF THE ESTATE OF CARRIE DAISEY, PLAINTIFFS-APPELLANTS,
v.
KEENE CORPORATION AND OWENS-CORNING FIBERGLAS CORPORATION, DEFENDANTS-RESPONDENTS, AND RAYMARK INDUSTRIES, INC.; GAF CORPORATION; CELOTEX CORPORATION; H.K. PORTER COMPANY; SOUTHERN TEXTILE CORPORATION; EAGLE-PICHER INDUSTRIES, INC.; KEENE CORPORATION; OWENS-ILLINOIS GLASS COMPANY; PITTSBURG CORNING CORPORATION; OWENS-CORNING FIBERGLAS CORPORATION; JOHN DOE CORPORATIONS ONE THROUGH TEN, DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Submitted October 4, 1993.
Decided November 1, 1993.
*327 Before Judges PETRELLA, BAIME and CONLEY.
Greitzer & Locks, attorneys for appellants (Michael A. Galpern, of counsel and on the brief).
McCarter & English, attorneys for respondent, Keene Corporation (Andrew T. Berry, of counsel, John C. Garde and Debra M. Perry, on the brief).
Kelly, Jasons, McGuire & Spinelli, attorneys for respondent, Owens-Corning Fiberglas Corporation (Joseph W. McGuire, of counsel and on the brief).
The opinion of the court was delivered by CONLEY, J.A.D.
*328 Following a five-day trial on plaintiffs' asbestos personal injury action, the jury found that plaintiff Willis Daisey did not have an asbestos-related injury. Plaintiffs appeal that verdict and we affirm.
We need not recount in detail all of the evidence presented during the trial. It is undisputed that during his employment from 1939 to 1964, plaintiff had been substantially exposed to asbestos. It is also undisputed that that occupational asbestos exposure has resulted in pleural thickening in his lungs. What injuries plaintiff has sustained as a result of that thickening and whether any other conditions and injuries are related to his asbestos exposure, was hotly contested.
Dr. Guidice, plaintiffs' expert, testified that prior chest x-rays showed bilateral interstitial fibrosis, pleural thickening and pleural plaques, all related to the asbestos exposure. He noted that pulmonary function testing showed obstructive lung disease caused by both cigarette smoking and asbestos exposure. He explained that plaintiff's productive cough and occasional wheezing were not attributable to asbestos exposure. But he concluded that plaintiff's shortness of breath was consistent with occupational asbestos exposure. Dr. Guidice diagnosed plaintiff as suffering from pleural asbestosis, asbestosis pleural plaque formation and parenchymal asbestosis.
Defendants' medical expert, Dr. Alan Pope, agreed with Dr. Guidice that the prior x-rays showed evidence of pleural thickening and interstitial fibrosis. He disagreed that they showed anything more. Dr. Pope acknowledged that some of the pleural thickening was associated with plaintiff's occupational asbestos exposure. When questioned whether "when we talk about pleural asbestosis or pleural asbestos disease, we're talking about scarring in the pleura caused by asbestos fibers," Dr. Pope responded in the affirmative. However, he disagreed that the interstitial fibrosis was evidence of asbestosis and opined that it was caused by non-asbestos-related obstructive lung disease. Dr. Pope further *329 opined that plaintiff's cough, chronic bronchitis and shortness of breath were not asbestos-related conditions but were caused by plaintiff's earlier cigarette smoking. Pulmonary function tests, he said, did not show evidence of an asbestos-related disease. The jury obviously found Dr. Pope's testimony credible.

I.
After all the evidence was presented, plaintiffs moved for a directed verdict on an asbestos-related injury, pointing out that both Dr. Guidice and Dr. Pope agreed plaintiff had pleural thickening related to his asbestos exposure. Plaintiffs contend the trial judge's denial of that application was error. We disagree. See Caterinicchio v. Pittsburgh Corning Corp., 127 N.J. 428, 437, 605 A.2d 1092 (1991); Sullivan v. Combustion Engineering, 248 N.J. Super. 134, 140, 590 A.2d 681 (App.Div.), cert denied, 126 N.J. 341, 598 A.2d 897 (1991). It is for the jury to determine whether pleural thickening constitutes an injury. Ibid.
Caterinicchio is dispositive. There, as here, the medical experts agreed that plaintiff had pleural thickening related to asbestos exposure. Plaintiff's expert opined that plaintiff suffered from asbestos-related disease while the defense expert concluded that plaintiff's pleural changes caused no disability or impairment. The trial court granted plaintiff's motion for a directed verdict, holding that pleural thickening constituted an injury as a matter of law, and allowed the jury to determine only the extent and nature of the injury. We reversed, holding that the trial court erred in removing the question of liability for pleural thickening from the jury. Observing that "[p]leural thickening ... are benign changes of the pleura," 127 N.J. at 434, 605 A.2d 1092, the Supreme Court affirmed. In doing so, it adopted the reasoning of the United States Court of Appeals for the Third Circuit in Howell v. Celotex Corp., 904 F.2d 3, 5 (3rd Cir.1990) where that court concluded:
[T]he presence of pleural thickening may not, alone, mandate a jury finding of compensable injury for an otherwise healthy plaintiff. We conclude that the substantial medical disagreement over the classification of pleural thickening *330 prevents us from declaring it to be an injury as a matter of law. The question is factual and remains within the province of the trier of fact.

[Caterinicchio, 127 N.J. at 437, 605 A.2d 1092 (quoting Howell, 904 F.2d at 5)].
Like the doctors in Caterinicchio, the experts here agreed plaintiff had pleural thickening that was related to his asbestos exposure. But Dr. Pope did not agree with Dr. Guidice that such thickening was symptomatic. Although he responded affirmatively to the question "when we talk about pleural asbestosis or pleural asbestos disease, we're talking about scarring in the pleura caused by asbestos fibers," his testimony makes it plain that he did not believe that that condition caused an injury or disability. Dr. Pope testified that the chronic fibrosis seen on plaintiff's x-rays was probably not the result of asbestos exposure. He stated that the results of plaintiff's pulmonary function tests were within normal limits and opined that plaintiff suffered impairment of his lung functioning because of his smoking history, not because of his asbestos exposure. He also testified that plaintiff's shortness of breath and productive cough was caused by cigarette smoking, not asbestos exposure.
To be sure, Dr. Guidice opined differently. But it was not for the court to remove that factual dispute from the jury. What plaintiffs overlook is that the condition of pleural thickening, though asbestos related, cannot be said, as a matter of law, to always cause injury. If there is medical dispute as to that, as there was here, the jury must resolve it.

II.
Reports of x-rays taken August 20, 1982, November 8, 1983 and July 16, 1986 were admitted into evidence during the trial. The 1986 report found:
Lungs are hyperaerated and there is some prominent interstitial markings in the lower lung fields most likely related to chronic obstructive pulmonary disease with interstitial fibrosis. There is a suggestion of pleural plaque in the periphery of the left mid lung field.
*331 The 1982 report found "chronic interstitial fibrosis," as did the 1983 report. Both Drs. Guidice and Pope, during their de bene esse deposition testimony, stated that they did not consider these reports in arriving at their opinions since each reviewed the actual x-rays themselves. On direct examination of Dr. Guidice, in response to a question whether he incorporated the observations of the radiologists, the doctor said:
Well, I did review all the x-rays from the x-ray reports that were available, and what was important enough for me to place in my report was the fact that the opinions shared by four different radiologists that I reviewed, four different reporting radiologists, were exactly consistent with my interpretations of those x-rays, so that there was consistency.
Plaintiffs' counsel also questioned Dr. Pope on cross-examination about the radiologists' reports.
Q. Doctor, if radiologists had read the same x-rays that you  as you did and had a different opinion as did you, would that in any way change your opinion?
MS. KEELEY: Objection.
THE WITNESS: I'm not certain why it should, because I had the opportunity to look at the x-rays myself.
....
MS. KEELEY: Objection, hearsay.
THE WITNESS: You know, you're  you're creating a hypothetical situation and the answer is, is that in this particular case, I had the opportunity to review the x-rays. I sat down with all of them together which perhaps if the radiologists had reviewed them they didn't have the opportunity to look at all of them together. And there would be no reason for me to rely on somebody else's opinion when something's right in front of me.
Prior to playing for the jury the video testimony of both doctors, the trial judge sustained defendants' objections to the above questions and answers which were designed to elicit whether the observations of the radiologists were or were not consistent with each doctor's opinion. Plaintiffs argue that this ruling was erroneous and substantially affected their ability to probe the credibility of Dr. Pope. Defendant, on the other hand, argues that these questions sought to elicit the contents of the reports, which would be inadmissible hearsay. Compare N.J.R.E. 703 and Theer v. Philip Carey Co., 133 N.J. 610, 630, 628 A.2d 724 (1993) with Grassis v. Johns-Manville Corp., 248 N.J. Super. 446, 456 n. 7, 591 *332 A.2d 671 (App.Div. 1991) and Hartman v. Yawger, 212 N.J. Super. 187, 190-91, 514 A.2d 545 (Law Div. 1986).
We need not address the issue of whether hearsay opinions relied upon by an expert witness may be admissible substantively under Evid.R. 56(2) (N.J.R.E. 703). The reports were already in evidence and defendant requested no limiting instruction as to the jury's use of them substantively. But we do not think the trial judge abused his discretion in this evidentiary ruling. The entire thrust of the questioning was the suggestion that the three radiologists had arrived at conclusions that were inconsistent with Dr. Pope's opinion. Yet nowhere in the reports themselves is there any inkling that the observed interstitial fibrosis and pleural thickening constituted asbestos injuries. Dr. Pope agreed plaintiff had interstitial fibrosis and pleural thickening. He disagreed that the pleural thickening was symptomatic and opined that plaintiff's coughing, wheezing and shortness of breath were caused by the interstitial fibrosis that was related to his history of smoking. Nowhere in the reports is there any basis for assuming the radiologists would conclude to the contrary. Simply put, their reports did not address what had caused the conditions shown on the x-rays. Since that was the assumption of the questions, the trial judge properly sustained the objection.

III.
Plaintiffs claim misconduct on the part of counsel for Owens-Corning during cross-examination of plaintiff and in his summation that deprived them of a fair trial. The misconduct relates to questions and summation remarks focusing upon trial preparation and summation remarks focusing upon settlement with other defendants.
During cross-examination of plaintiff, counsel probed him on inconsistencies in deposition testimony and trial testimony concerning which defendant's products he recalled being exposed to. In the course of this questioning, counsel asked:

*333 Q. [A]nd Sir, just to digress for a minute, before your testimony today, you spent a number of hours with your attorney here preparing your testimony, didn't you?
MR. GALPERN: Objection, Judge.
THE WITNESS: I didn't spend a number 
MR. GALPERN: Attorney-client privilege.
THE COURT: He hasn't asked a privileged question yet. Overruled. I'll allow it.
Q: Sir, you spent a number of hours preparing your testimony for today, didn't you sir?
A: I was with my attorney.
Defense counsel continued:
Q: No, how long have you met with [counsel] before you prepared for your testimony today?
A: How long have I met with him?
Q: Yes.
....
Q: Is it fair to say you spent several hours with him going over your testimony for today?
A: No, not several hours.
Q: An hour or two?
A: Maybe an hour or two.
Q: Okay. How long did it take him to tell you to tell the truth? How long did that take in the entire preparation?
A: Probably takes a second.
Q: That's all it took, about a second, for him to tell you that. Now, we just took a break again, the jury did, from like 11:00 to 11:20; is that correct?
A: We just took a break.
Q: And again, [counsel] took you back in one of those preparation rooms to talk with you again, didn't he?
A: We had a little talk, yes.
Plaintiffs contend that this line of questioning inferred that counsel improperly coached plaintiff. They argue that counsel thus was left with the choice of leaving the jury with the conclusion that he had prepared plaintiff, or asking plaintiff what was discussed in their pre-trial meeting, thus waiving the attorney-client privilege. He chose the latter and on re-direct attempted to have plaintiff explain what they discussed during the break. The attempt, however, was thwarted by defense objection on the grounds of hearsay and on the further, plainly incorrect, assertion that the cross-examination had only related to preparation for *334 deposition testimony, not the trial testimony. The objection was sustained. Counsel returned to the theme of trial preparation in his summation when he said:
And I asked him, Did you prepare your testimony with Mr. Galpern? Well, he's kind of fudging there. I guess we had two hours. Then Mr. Galpern comes back with the old response, What did I tell you to do? Tell the truth. Yeah, that's good. That took about ten seconds. What did you guys talk about for the other hour and 59 minutes? Do you think maybe they talked about the fact that the only people that were left were Miss Keeley from Monoblock, and me from Owens-Corning Fiberglas?
The conduct of a trial, including cross-examination and the appropriate limits thereon, is within the discretion of the trial court. Exercise of that discretion is ordinarily not interfered with unless there is a clear abuse of discretion which has deprived plaintiff of a fair trial. Janus v. Hackensack Hospital, 131 N.J. Super. 535, 540-41, 330 A.2d 628 (App.Div. 1974), cert denied, 67 N.J. 95, 335 A.2d 47 (1975). See Lovenguth v. D'Angelo, 258 N.J. Super. 6, 12, 609 A.2d 47 (App.Div. 1992), appeal dismissed, 133 N.J. 417, 627 A.2d 1128 (1993) (counsel's unfair attack on defendant during cross-examination for refusal to answer interrogatories and failure to appear for deposition did not justify new trial).
Here counsel had every right to pursue on cross-examination the inconsistencies in deposition testimony. And we see nothing improper in inquiring as to whether plaintiff met with his attorney prior to trial or during a break. But we think the additional questions, as well as the remarks during summation, plainly suggesting plaintiff was told what to say in order to obtain a judgment against the remaining defendants, whether true or not, exceeded the scope of proper examination and fair comment on the evidence. And we note that the problem was further compounded when plaintiff was prevented on re-direct from responding to that suggestion.
But the only objection raised during cross-examination was that the questions triggered attorney-client privilege. The specific question objected to did not, however, seek the contents of the *335 meeting or do anything more than ask if plaintiff had met with counsel prior to testifying. The objection, then, as to that question was as properly overruled. No further objections were raised and no objection to counsel's remarks during summation concerning trial preparation was made. Although the suggestion that counsel improperly coached plaintiff prior to trial was improper, under the circumstances we do not think it deprived him of a fair trial. See Gaido v. Weiser, 115 N.J. 310, 311, 558 A.2d 845 (1989). Moreover we note that the misconduct relates to plaintiff's testimony concerning his exposure to the remaining defendants' products. The jury never reached that issue because it concluded plaintiff did not suffer an asbestos-related injury and thus the error was harmless. Cf. Ragusa v. Lau, 119 N.J. 276, 284, 575 A.2d 8 (1990).
Plaintiffs also contend misconduct in the following remarks during summation:
Again, he sued GAF, which is Ruberoid. He sued these people, and settled with them. He doesn't remember working around it, but no, what they did, they sure took their money. So, you mean this guy worked around all these products, and doesn't remember them, but took their money when he sued that client? He mentioned Johns-Manville. Did you hear him mention it up there? These are his statements. He signed it. January 14, 1990. And you can read it for yourself. These are the products he said he worked around. And now, all of a sudden, he doesn't remember those, except mine. That's because I'm the only one left with respect to the product.
You have to assign a percentage to what our responsibility is. The other ones are all settled. And it has to add up to 100 percent. Well, we don't know what the other people settled for, because what he wants is overreaching. He wants 300 percent of the actual verdict, 400. The more the better. In fact, he laughs about it now, and he laughs about it when you're not around. He thinks it's funny.
Counsel objected to this as "improper and incorrect." The trial judge agreed, instructed defense counsel to "refrain" and, in response to a request for curative instructions, told the jury "you are to decide this case on the facts, not on characterization of counsel or the parties."
Plaintiffs argue that these comments amount to an unfair, unwarranted and prejudicial attack upon trial counsel which requires reversal. See Henker v. Preybylowski, 216 N.J. Super. 513, *336 519, 524 A.2d 455 (App.Div. 1987). In Henker, counsel in summation said:
[p]laintiffs are people that were forced to go to court because defendant challenged them on liability. We Won. One hundred percent. Does defense give up? No. They come back and challenge us on our injuries with no evidence....
....
[They are] here for one purpose, and that's to hold down the damages as much as possible. I can't tell you how much to give, but he's trying to lowball it. He want's you to low ball it....
....
Where is [defendant attorney's] MD degree?
[Henker v. Preybylowski, 216 N.J. Super. at 518, 524 A.2d 455].
In Henker, plaintiff's attorney also accused defendant's attorneys of wanting the jury to evaluate the evidence unfairly, of trying to deceive the jury of deliberately distorting the evidence and of playing a game. Noting that "[p]erhaps none of these comments standing alone is out of bounds," we found that taken together they represented "a deliberate effort by plaintiffs' attorney to have the jurors see themselves as destroyers of evil forces, personified by defendant and his attorney, that have been depriving his clients of justice." Ibid.
In the present case, the remarks by defense counsel were improper. But we do not think they reached the level of those in Henker. Moreover, they were, to some extent, cured by judicial instruction to the jury to decide the case solely on the evidence. E.g. Foote v. Erie Lackawanna Railway Co., 142 N.J. Super. 195, 204-05, 361 A.2d 62 (App.Div. 1976); State v. Stulman, 136 N.J. Super. 148, 162-163, 345 A.2d 329 (App.Div. 1975). And we cannot say that defense counsel's comments tainted the entire verdict and resulted in a miscarriage of justice. Accord Lovenguth v. D'Angelo, 258 N.J. Super. 6, 609 A.2d 47. The prejudicial remarks related primarily to whether any of plaintiff's exposure was caused by the remaining defendants' products. The jury did not reach that issue and therefore any error was harmless.
*337 Finally, we dispose of plaintiffs' complaint concerning defense counsel's interruption during summation to object to references to plaintiff's deposition testimony. In so objecting, counsel characterized plaintiff's attorney as misleading the jury "unless he's going to tell the jury that halfway through, he took him out in the hallway." There was no cause for this interruption and the suggestion counsel was misleading the jury was improper. The trial judge immediately responded "Now, [counsel] ... It was read to the jury. It's fair comment ... That was read to the jury, and that's what he talked about at his deposition. And that's what he talked about throughout this trial, ladies and gentlemen." To be sure, defense counsel's conduct was improper and unjustified. But the trial judge immediately responded, overruled the objection and gave a curative instruction to the jury. See Lovenguth v. D'Angelo, 258 N.J. Super. at 14, 609 A.2d 47. Compare Tomeo v. Northern Valley Swim Club, 201 N.J. Super. 416, 421, 493 A.2d 544 (App.Div. 1985).
Affirmed.